IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


ANTHONY O. JENNINGS, #285447          *
                    Plaintiff,
            v.                        *   CIVIL ACTION NO. WMN-14-1736

DOCTOR COLIN OTTEY                    *
P.A. GREG FLURY
                    Defendants.       *
                                    *****


**<u>MEMORANDUM</u>**


I.    PROCEDURAL HISTORY

       Anthony O. Jennings ("Jennings"), presently housed at the North Branch Correctional

Institution ("NBCI"), filed a civil rights complaint against Defendants Dr. Colin Ottey and

Physician's Assistant ("PA") Greg Flury seeking $1,000,000.00 in damages.  He alleges that he

injured his right knee and complained about it for over a year.  Jennings asserts that when seen

by a prison doctor and a PA, he was referred to Bon Secours Hospital ("BSH") in Baltimore,

Maryland, where on June 27, 2012, a doctor advised that arthroscopic surgery was needed for his

knee.  He complains that neither Ottey nor Flury followed up on the surgical recommendation for

over one year.  ECF No. 1.  Jennings was permitted to amend his Complaint to allege that Ottey

and Flury "knowingly and intentionally ignored" the BSH surgeon's recommendation and

prescription order.  ECF No. 9.

II.   PENDING MOTIONS

       Defendants Ottey and Flury's original Motion to Dismiss was denied by this Court and

they were ordered to file a motion for summary judgment with exhibits.  *See* ECF No. 27.  They

have now filed a Motion for Summary Judgment[1]  to which Jennings has filed a response.  ECF

Nos. 36 & 40.  In addition, Jennings has filed his own Motions for Summary Judgment and for

Appointment of Counsel.  ECF Nos. 28, 31, 32, 40 & 41.

III. STANDARD OF REVIEW

Summary Judgment is governed by Fed. R.Civ. P. 56(a), which provides, in part:

> The court shall grant summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is entitled to judgment
> as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of *some*
> alleged factual dispute between the parties will not defeat an otherwise
> properly supported motion for summary judgment; the requirement is that
> there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).  In

resolving the motion, the court should "view the evidence in the light most favorable to ... the

nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the

witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644–45 (4th

Cir. 2002).  However, "[t]he party opposing a properly supported motion for summary judgment

'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth

specific facts showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens*

*Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R.

---

[1] Accompanying defendants' dispositive motion is an 877-page exhibit containing plaintiff's medical record.  *See* ECF No. 36, Ex. A. The court initially could not locate this exhibit.  Consequently, counsel was directed to re-file the filed-separately exhibit and to inform the Court when Jennings was served with the exhibits.  ECF No. 42.  Defendants refiled the exhibit and indicated that Jennings was served with the exhibit on March 13, 2015.   ECF No. 43.  The original exhibit, filed in March, 2015, has been located and made part of the record.

Civ. P. 56(e)).  Moreover, the court must abide by the " 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.' " *Bouchat,* 346 F.3d at 526 (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986)).

IV. DISCUSSION

Facts

Defendants Ottey and Flury do not dispute that Jennings was examined by BSH orthopedic surgeon Ashkok Krishnaswamy on May 25, 2012, and was diagnosed with early arthritis, a potentially torn meniscus, and a possible anterior cruciate ligament ("ACL") tear in his right knee.  ECF No. 36, Ex. A, pgs. 506-507.   On June 27, 2012, an MRI was performed on Jennings' right knee which showed that he had an irregularity in his quadriceps fat pad, an irregular tear at the body of the lateral meniscus, and trace joint effusion.  *Id.*, Ex. A, pgs. 458-459; Ex. B, Ottey Aff.

On July 6, 2012, Jennings received facial surgery for a Le Fort fracture.[2]  The procedure was followed by six weeks of post-operative care in the prison infirmary.  *Id.*, Ex. B, Ottey Aff. During the course of his January 7, 2013, examination by PA Flury, Jennings inquired into the status of surgery or further consultation for the right knee.  Flury was unable to locate paperwork regarding an orthopedic consultation and the medical records staff was notified to pull the record for "provider review."  *Id.*, Ex. A, pgs. 3-5.   At a January 10, 2013, examination by Dr. Ava Joubert, Jennings informed the physician that he believed he was to be scheduled for knee surgery because a previous MRI showed defects in his knee.  *Id.*, Ex. A, pg. 7.  He continued to

---

[2] Le Fort fractures are classic in facial trauma and are types of facial fractures involving the maxillary bone and surrounding structures in a usually bilateral and either horizontal, pyramidal or transverse way.  *See* www.med-college.hu/de/wiki/artikel.php?id=354&lan=2.

complain of right knee pain and appeared at sick-call wearing his knee brace.  ECF No. 36, Ex. A, pg. 14.  Two weeks later, on January 23, 2013, Jennings was examined by PA Flury, who noted that Jennings was being considered for knee surgery, but his recovery from his facial fracture and surgery took precedence over his requested knee surgery.  *Id*., Ex. A, pgs. 16-17; Ex. C, Flury Aff.

Jennings' scheduled January 28, 2013, MRI of his knee was postponed  to allow recovery from facial surgery.  *Id*., Ex. A, pg. 21; Ex. B, Ottey Aff.  On February 11, 2013, he was examined by PA Flury, who referred to the irregular meniscus tear noted in Jennings' June 2012 MRI.  Flury requested a second reading of the MRI to identify any abnormalities in Jennings' ACL, as the notes from his MRI showed a tear in his meniscus, but did not reference a tear in his ACL.  *Id*., Ex. A, pg. 31; Ex. B, Ottey Aff.: Ex. C, Flury Aff.  Flury examined Jennings on April 18, 2013, and discussed the option of physical therapy for the knee.[3]  *Id*., Ex. A, pg. 61.  Jennings was treated with pain medication and anti-inflammatory drugs such as acetaminophen and Mobic.  *Id*., Ex. A, pgs.  435-436, & 444.

On May 7, 2013, Jennings requested a new knee brace, which was ordered by Flury on May 14, 2013.  *Id*., Ex. A, pgs. 56 & 68.  Flury also observed that they were awaiting a decision regarding whether Jennings would receive orthopedic surgery or physical therapy for his knee. *Id*., Ex. A, pgs. 64 & 68; Ex. B, Ottey  Aff.; & Ex. C, Flury Aff.  Ottey indicated he would review Jennings' radiology reports and discuss them with the orthopedic surgeon.  *Id*., Ex. A, pg. 77.  On June 20, 2013, Jennings' lower-tier status was renewed due to his knee instability.  *Id*., Ex. A, pg. 79.

---

[3] Jennings was receiving physical therapy for his facial fracture during February and March, 2013.  ECF No. 36, Ex. A, pg. 48-49.

On August 2, 2013, Jennings received a consultation with Dr. Krishnaswamy related to orthopedic surgery.  Krishnaswamy noted that Jennings had a possible torn meniscus and ACL tear with persistent internal derangement[4] and advised Jennings that he would benefit from arthroscopic surgery of the right knee.  ECF No. 36, Ex. A, pgs. 274 & 456.  On September 17, 2013, Jennings was approved for knee surgery and eight days later on September 25, 2013, Flury completed a pre-operative evaluation to clear Jennings for arthroscopic knee surgery.  *Id*., Ex. A, pgs. 130 & 137.

Jennings received the knee surgery on October 8, 2013.  The post-operative report showed that arthroscopic surgery of the right knee, a partial lateral medial meniscectomy and a partial synovectomy with manipulation of the right knee was performed under anesthesia.[5]  *Id*. Ex. A, pg. 285.  Subsequent records show that Jennings was post-surgically seen by Drs. Krishnaswamy and Ottey; an x-ray was performed on his right knee showing no evidence of an acute fracture, dislocation, or subluxation, with preserved joint spaces and alignment; an MRI was taken of his right knee, which showed a minimal irregularity on the interior surface of Jennings' lateral meniscus, consistent with a minimal tear;  no ACL tear and post-surgical

---

[4] Internal derangement is an old term that describes internal damage to the joint generally caused by trauma.  *See* http://www.mdguidelines.com/internal-derangement-of-knee

[5] The knee has three parts.  The thigh bone (femur) meets the large shin bone (tibia) forming the main knee joint.  This joint has an inner (medial) and an outer (lateral) compartment.  The kneecap (patella) and the femur form a third joint, called the patellofemoral joint.  *See* http://www.medicinenet.com/script/main/art.asp?articlekey=8848.  An arthroscopic meniscectomy is a procedure to remove some or all of a meniscus from the tibio-femoral joint of the knee using arthroscopic (aka 'keyhole') surgery.  In a complete meniscectomy the meniscus including the meniscal rim is removed. A partial meniscectomy involves partial removal of the meniscus.  This may vary from minor trimming of a frayed edge to anything short of removing the rim.  *See* http://www.physio-pedia.com/Arthroscopic_Meniscectomy.  A synovectomy is an operation performed to remove partial or all the synovial membrane of a joint.  *See* http://www.orthopale.com/synovectomy.php.

changes in the patellar fat pad consistent with prior arthroscopic surgery, as well as prepatellar bursitis.[6]  ECF No. 36, Ex. A, pgs. 163, 185, 192,  195, 285, & 287-289.

On March 13, 2014, Dr. Joubert discussed the results of the MRI with Jennings and explained that it showed no ACL tear, an irregularity consistent with a minimal tear which could also represent a repaired tear, and prepatellar bursitis.  Joubert recommended that Jennings receive a steroid injection.  *Id*., Ex. A, pg. 229.  An additional x-ray was performed on April 1, 2014, which showed no evidence of an acute fracture, dislocation, or subluxation.  *Id*., Ex. A, pg. 235.  Jennings was placed on meloxicam and Ultram for pain and inflammation.  *Id*. , Ex. A, pgs. 543 & 547.

Nine days later, on April 10, 2014, Jennings saw Dr. Joubert and complained that he injured his left knee two months earlier and had sought treatment.  *Id*., Ex. A, pg. 240.  Joubert explained that his x-rays were negative and diagnosed him with a probable ligament strain or sprain.  He was advised to use a knee sleeve and to take anti-inflammatory medication.  *Id*.  On April 20, 2014, Jennings received an additional knee brace.  *Id.*, Ex. A, pgs. 247 & 305.

In July and August of 2014, medical staff observed that Jennings was not compliant with his knee conditioning and strengthening exercises.  *Id*., Ex. A, pgs. 709 & 719.  Jennings received physical therapy for his knee in October of 2014.  On October 28, 2014, the physical therapist, Stephen Ryan, noted that Jennings' right knee was slightly improved, with an increase in flexibility and a decrease in pain.  *Id*., Ex. A, pgs. 742, 744, 754 & 761.  Jennings received a steroid injection to his knee on January 3, 2015, and received additional physical therapy in January and February of 2015.  *Id*., Ex. A, pgs. 786, 799 & 801.  On January 13, 2015, he complained of knee pain that was worsening.  Additional x-rays were ordered on January 13,

---

[6] Prepatellar bursitis is an inflammation of the bursa in the front of the kneecap (patella).  It occurs when the bursa becomes irritated and produces too much fluid, which causes it to swell and put pressure on the adjacent parts of the knee.  *See* http://orthoinfo.aaos.org/topic.cfm?topic=a00338.

2015.  According to Defendants, these tests confirmed that there was no evidence of fracture, dislocation or subluxation.  ECF No. 36, Ex. A, pg. 795.  On January 3, 2015, Jennings received a steroid injection from Dr. Ali Yahya.  He also obtained a renewed course of physical therapy in January of 2015.  *Id*., Ex. A, pgs. 486, 794, 799, 801-803, 813-814.

In his Motions for Summary Judgment and Oppositions, Jennings contends that he has demonstrated that he suffers from a serious medical need and that he "had to have surgery on his right knee" but Defendants disregarded the risk of serious harm to him and intentionally delayed his access to appropriate care for his injured knee.  ECF Nos. 32 & 40.  He claims that he injured his knee in the spring of 2011, and was seen and treated for his knee with injections by a Dr. Espina in August of 2011.  ECF No. 40.  Jennings states that he was treated for the knee pain during the remainder of 2011 and 2012 and was recommended for knee surgery prior to his facial surgery in 2012.  *Id*.

Analysis

With regard to the claims raised against Defendants, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991)).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to his serious medical needs.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was

suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.[7]  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (stating there is no expectation that prisoners will be provided with unqualified access to health care).   Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition.   *Farmer*, 511 U.S. at 839-40.   "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).   "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844).   If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.   Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.   *Brown*, 240 F. 3d at 390 (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998), for the proposition that focus must be on precautions actually taken in light of suicide risk, not those that could have been taken). Inmates do not have a constitutional right to the treatment of their choice, *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the

---

[7] A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

necessity for or extent of medical treatment do not rise to a constitutional injury.  *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

There is no dispute that Jennings was evaluated by an orthopedic surgeon from BSH in 2012 and was diagnosed with early arthritis, a potentially torn meniscus, and possible ACL tear in his right knee.  On June 27, 2012, an MRI was performed on Jennings' right knee which showed that he had an irregularity in his quadriceps fat pad, an irregular tear at the body of the lateral meniscus, and trace joint effusion.  The surgeon recommended arthroscopic surgery.  The following month, however, Jennings received surgery for trauma sustained to his face following an altercation, which necessitated almost two months of post-operative infirmary care.  Medical personnel determined that the treatment and care for the facial surgery took precedence over orthopedic surgery.  He received knee surgery in October of 2013.  The record presented to the Court, however, shows that prior to his knee surgery in 2013, Jennings was prescribed pain and anti-infammatory medication, given a knee brace/sleeve, provided steroid injections and physical therapy, and directed to have limited weight bearing and a cane for mobility.  He was seen by a number of nurses, PAs, and physicians on site.  Further, he received examination from an orthopedic surgeon for pre-operative and post-operative care.  While Jennings may be dissatisfied with the course of treatment and the health care professionals he saw, the conservative care he received given his established right knee condition met the minimum constitutional requirements.  No Eighth Amendment violation has been demonstrated.[8]

---

[8] Title 28 U.S.C. § 1367(a) states, in part, that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  Supplemental jurisdiction, also called pendant jurisdiction, only includes "other claims" related to "claims *in the action*" that convey original jurisdiction.  Under supplemental jurisdiction, the federal claim acts as a jurisdictional "crutch."  David

V.      CONCLUSION

For the aforementioned reasons, Defendants' Motion for Summary Judgment is granted.[9]

Jennings' Motion for Summary Judgment shall be denied.  In light of this decision, Jennings'

Motions to Appoint Counsel shall be denied.  A separate Order effecting the rulings made in this

opinion is entered herewith.


Dated: July 22, 2015                              _____/s/_____
                                                  William N. Nickerson
                                                  Senior United States District Judge


---

D. Siegel, Commentary on 1990 Revision, appended to 28 U.S.C.A. § 1367 (West 1993).  The Complaint presents no federal claims to which the state law claim could attach to convey supplemental or pendant jurisdiction.  In the absence of establishing a constitutional deprivation, Jennings does not show that this court can exercise supplemental jurisdiction over any arguable claim of negligence.

[9] Defendants' supporting memorandum cites to isolated portions of the record that concern Jennings's right knee complaints and treatment.  *See* ECF No. 36 at Mem.   Defendants have put into the public record a large amount of Jennings' medical record, including dental, ophthalmological, and cardiovascular materials, which are irrelevant to the case.   Defendants will not be allowed to place Jennings' medical history out for public scrutiny when fewer documents, together with a declaration presented under Fed. Rule of Evidence 803(10) would have sufficed to demonstrate that Ottey and Flury did not impede Jennings from receiving constitutionally adequate care for his right knee.   Counsel is cautioned to be more careful in submitting personal information in the future.   I will direct the Clerk to seal the medical record exhibit in its entirety in order to protect Jennings' privacy.